Burke, J. (dissenting).
The New York State Labor Relations Act was enacted in 1937, in recognition of “ The economic necessity for employees to possess full freedom of association, actual liberty of contract and bargaining power equal to that of their *40 employers, who are frequently organized in corporate or other forms of association” (Labor Law, § 700). Indeed, our court quickly recognized the act as a legislative enactment intended to provide a procedure for the disposal of labor controversies which, when adopted and availed of by the parties to controversies, should terminate disputes. (See Florsheim Shoe Store Co. v. Retail Shoe Salesmen’s Union, 288 N. Y. 188, 198; United Baking Co. v. Bakery & Confectionery Workers’ Union, 257 App. Div. 501, 504.) The act created the State Labor Relations Board (§ 702), gave recognition to the rights of employees (§ 703), and then noted specific instances wherein the conduct of the employer would constitute an “unfair labor practice” (§ 704). A subdivision of that section made it an “ unfair labor practice ” for an employer to refuse to bargain collectively with the certified representatives of his employees (§ 704, subd. 6). While most of the subsequent sections of the act merely pertain to the various procedural aspects for its implementation, section 713, as originally enacted, provided that nothing in the act “ shall be construed so as to interfere with, impede or diminish in any way the right of employees to strike or engage in other lawful, concerted activities.”
As the majority opinion quite properly indicates, there were numerous strikes at nonprofitmaking hospitals in New York City during the summer of 1962. Public reaction to the disruptive effect of these strikes on the orderly conduct of hospitals ’ business forced Governor Rockefeller to intercede in these strikes and to agree to the creation of specific legislation to deal with nonprofitmaking hospitals, thereby putting an end to such strikes. In July, 1963, section 716 of the Labor Law was engrafted on the pre-existing Labor Relations Act to bring nonprofitmaking hospitals located in cities with a population in excess of one million people within its scope. In furtherance of this legislative act, two existing sections (Labor Law, §§ 713, 715), patently conflicting with section 716, were amended to eliminate apparent inconsistencies. (See Reilly, New York Nonprofit Hospitals and the Labor Relations Act: The Pitfalls of Emergency Legislation, 17 Syracuse L. Rev. 482.)
In enacting this legislation, a particular effort had to be made to preserve the constitutional rights of the hospital employees. Our State Constitution clearly and unequivocally guarantees *41 the right of employees “ to organize and to bargain collectively through representatives of their own choosing.” (N. Y. Const., art. I, § 17.) Moreover, the Supreme Court has often stated in a different setting that the right to picket and to strike is an essential concomitant of the right to engage in collective bargaining. (See Bus Employees v. Missouri, 374 U: S. 74; Bus Employees v. Wisconsin Bd., 340 U. S. 383.)
Section 716 was thus intended to serve a dual purpose; it was to guarantee the continued care of patients in nonprofitmaking hospitals, and, at the same time, to preserve the constitutional right of employees to bargain collectively through duly elected representatives. To protect hospital patients, employees were forbidden to strike. To safeguard the employees ’ rights, section 716 created a prompt means for employee representatives to have review of all their “ disputes ” and “ grievances.” The statutory definitions of these terms, set forth in the majority opinion, are indeed broad in scope.
It is not necessary to reproduce the full text of section 716 at this time. Bather, it is sufficient to note that Local 144 was employing these provisions prior to the commencement of the present action. After receiving the support of the maintenance employees in an election, and following its certification by the State Labor Belations Board as the proper bargaining representative for these maintenance employees of Long Island College Hospital, Local 144 requested that hospital to bargain collectively with it. When this request was refused, the union invoked the provisions of subdivision 4 of section 716. The Industrial Commissioner appointed a three-man fact-finding commission and, when its recommendations were also rejected by Long Island College Hospital, the Industrial Commissioner sent the controversy to compulsory arbitration before the New York State Board of Mediation. The hospital brought the present actions, seeking in essence to enjoin the fact-finding commission from functioning in accordance with the legislative plan by requesting a stay in the compulsory arbitration proceeding.
The majority opinion is quite clear in expressing its understanding of the issue involved in this litigation. They state: ‘ ‘ The basic question presented in these cases * * * is this: Where a nonprofitmaking hospital challenges the representation *42 status of a union, does section 716 of the New York State Labor Law, enacted in 1963, empower the New York 'State Industrial Commissioner to appoint a fact-finding commission to make recommendations for the settlement of the dispute and, if its recommendations are rejected, to submit the issues to compulsory arbitration before the New York State Board of Mediation? ” (p. 31 ; emphasis added). Since we conclude that the hospital has no right under section 716 to challenge the representative status of a certified union, we do not deem it necessary to view the case in that context.
It is well settled that this court, when interpreting a statute, is obliged to read the language of the statute closely and to draw plain inferences from that statute’s legislative history. Both the terms of section 716 and its legislative history clearly indicate that the Legislature did not intend to permit the hospital to contest a certified union’s representative status.
In enacting section 716, the Legislature considered and then rejected a bill which would have given the hospital the right to contest a union’s representation. The Savarese bill — a forerunner to section 716—had provided for mediation and compulsory arbitration of “ labor disputes ” between nonprofit-making hospitals and representatives of their employees. Under that proposal, the term ‘' disputes ’ ’ was given a much broader interpretation than that found in the final enactment, as it included controversies “ concerning the association or representation of persons.” (Joint Committee Report; N. Y. Legis. Doc., 1963, No. 38, pp. 76-78.) Had that provision been adopted, the representation issue would thus have come at least before the arbiter and, had the Legislature so chosen, ultimately before the Supreme Court where all aspects of his decision could have been made reviewable.
The detailed provisions of the New York State Labor Relations Act pertaining to representation and elections were first established in 1937. Without belaboring the point, it is sufficient to note that they are at least as comprehensive as those set forth in the Railway Labor Act, initially enacted in 1926. (44 U. S. Stat. 577, as amd.; U. S. Code, tit. 45, §§ 151-188.) The major objective of that act, according to the United States Supreme Court, was “ the avoidance of industrial strife, by conference between the authorized representatives of employer *43 and employee.” (Virginian Ry. Co. v. System Federation No. 40, 300 U. S. 515, 547.) Section 152 (subd. Ninth) of that act sets forth a machinery for the selection of the representatives of employees. That section authorizes the National Mediation Board, upon request, to investigate disputes over representation ; to “ designate ’ ’ those who are affected; to use a secret ballot or any other appropriate means of ascertaining the choice of the employees; to establish rules governing elections and to certify the representatives so chosen as the bargaining representatives of these employees in negotiations. In sum, there is an election, the results are examined and, barring irregularities, the results are certified. It is noteworthy that our Federal courts have consistently sustained the certification of the National Mediation Board under that act and have held that such certification need not be subject to judicial review. (See, e.g., Railway Clerks v. Employees Assn., 380 U. S. 650; Switchmen’s Union v. National Mediation Ed., 320 U. S. 297; United States v. Feasier, 376 F. 2d 147; Ruby v. American Airlines, 323 F. 2d 248.) It is our contention that the Legislature, in enacting section 716, concluded that, in the interest of preserving the employees’ constitutional right to bargain collectively, the determination of a representative unit in nonprofitmaking hospitals should lie solely with the State Labor Relations Board. The propriety of such a decision cannot be challenged in the light of the Supreme Court decisions[1], and in view of the Legislature’s own choice to avoid review by rejecting the Savarese bill.
The majority’s assumption that an employer must, at some point, be permitted to challenge the unit certified by the board before being compelled to submit to compulsory arbitration under section 716 is predicated on the scheme of the 1937 act. *44 Under section 704 (subd. 6) of the original act, it was an unfair labor practice for an employer to refuse to bargain collectively with the proper representatives of its employees. The statutory sequence permitted the representative to bring an unfair labor practice charge against the employer before the Labor Eelations Board (§ 706). During the pendency of that action the employees were permitted to engage in strikes and ‘ ‘ any other lawful, concerted activity ” (§ 706, subd. 5). If the board sustained the charge the employer could then obtain judicial review of the charge and, at the same time, bring before the court the propriety of the certification (§ 707). The employees could continue their “lawful activities” during this entire process. Significantly the original act did not provide for compulsory arbitration, had no provision specifically pertaining to nonprofitmaking hospitals, and declared that nothing in the entire article “ shall be construed so as to interfere with, impede or diminish in any way the right of employees to strike or engage in other lawful, concerted activities ” (§ 713). Finally, not even the original act would compel a union to commence an unfair labor practice action. Nevertheless the majority has apparently seen fit to compel Local 144 to file an unfair labor practice charge as a condition precedent to compulsory arbitration under section 716. They state that “a condition precedent to a union’s resorting to the provision of section 716 is the establishment of its exclusive representation status under sections 705 and 707 ” (p. 38). Had this been the intent of the Legislature when enacting" section 716, 26 years after the effective date of the act, it is reasonable to assume that they would have made some reference to it. We merely note that no such reference was made.
Section 706, dealing with the prevention of unfair labor practices, has permitted employees since 1937 to engage in strikes and other lawful, concerted activity while the unfair labor practice charge is investigated and, if it is sustained, while it is being reviewed by the Supreme Court. Thus, the employer has an avenue of review, and the employee is armed with effective weapons for penalizing" dilatory tactics. This was in accord with the general policy of the entire act:“ It is in the public interest that equality of bargaining power be established and maintained” (§ 700). We emphasize that section 713 was *45 amended in 1963 to prohibit employees of nonprofitmaking hospitals from employing those rights generally regarded as the concomitants of collective bargaining—specifically, strikes and lockouts. There is no longer an equality of bargaining power in an unfair labor practice charge for these employees. Moreover, since the employees are precluded from striking, an employer is less concerned with the results of any election since he knows that he must negotiate with someone. As we interpret section 716, a prompt submission of disputes to collective bargaining and compulsory arbitration was a quid pro quo for the legislative prohibition of strikes in nonprofit hospitals. Such an analysis, we submit, preserves the equality of bargaining power, considered essential to the entire act.
The majority opinion twice intimates that its decision is necessary to prevent minority unions from invoking section 716 before there has been a determination as to an appropriate bargaining unit '(pp. 37, 38). The fact is that Local 144 has already been certified as the majority union for the maintenance employees at Long Island College Hospital, confirming the election returns. Thus, when the majority contends that it is an unfair labor practice for an employer to arbitrate with a minority union, they fail to note that Local 144’s certification has established it as a majority union. (McGuire v. Humble Oil & Refining Co. (355 F. 2d 352), relied upon by the majority, is totally inapplicable to the present situation. In that case, the court merely concluded that it would be an unfair labor practice for the employer to negotiate with a minority union when another union had already been certified as the proper representative unit. Accordingly, the Hobson’s choice envisioned by the majority (p. 38) is illusory.
Following the enactment of section 716, lawsuits have been filed involving Long Island College Hospital, Park Avenue Clinic Hospital in Rochester, St. Joseph’s Hospital in Syracuse, Crouse-Irving Hospital in Syracuse (Reilly, New York Nonprofit Hospitals and the Labor Relations Act: The Pitfalls of Emergency Legislation, 17 Syracuse L. Rev. 482, 483, n. 8) and Roosevelt Hospital in New York City. It is too early to ascertain what effect the decision reached by the court in this case will have on these and analogous cases. However, we note that in Davis v. Roosevelt Hosp. (N. Y. L. J., Sept. 30, 1968, p. 16, *46 cols. 1, 2) the parties have already concluded compulsory arbitration. However, since Roosevelt Hospital preserved its challenge against the union’s certification, it is reasonable to presume that the results of that arbitration will be again delayed, pending this unnecessary review of the union’s certification. As we said above, the representation issue should be finally resolved when the board issues a certification. As a result of the 1963 amendment to section 713, the employees in nonprofit-making hospitals are at all times precluded from striking, thus reducing if not eliminating any interest an employer might have with reference to the particular union membership of his employees. Under such circumstances, and in light of the history of section 716, we conclude that an employer has no right to question the certification of a particular union.
We would affirm the orders of the Appellate Division.
Judges Scileppi, Jasen and Gibson* concur with Chief Judge Fuld; Judge Burke dissents and votes to affirm in an opinion in which Judges Bergan and Breitel concur.
In each case: Order reversed, without costs, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.

. The majority opinion expresses concern that a serious due process question exists in the absence of judicial review. Justice Fortas, in the same paragraph in Gardner v. Toilet Goods Assn. (387 U. S. 167, 177) which they quote, is quick to concede that the Legislature is the proper body to determine the form in which the remedy of review shall be exercised. Indeed, he cites with approval the decision of that court in the Switchmen’s Union case, which held that the certification by the National Mediation Board of a representative bargaining unit under the Railway Labor Act was sufficient, and that such certification need not be the subject of judicial review. The Supreme Court has thus clearly indicated that there is no due process problem in this present situation.

Designated pursuant to section 2 of article VI of the State Constitution in place of Keating, J., disqualified.