NATIONAL HYDRO SYSTEMS, INC.

v.

**Jack J. SCHRAMM, Regional Administrator Region III, United States Environmental Protection Agency.**

**Civ. A. Nos. 78–4030, 79–495.**

United States District Court,
E. D. Pennsylvania.

Dec. 28, 1979.

Sidney L. Wickenhaver, John C. Sullivan, Harrisburg, Pa., for plaintiff.

Antoinette R. Serritella, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

National Hydro Systems, Inc. (NHS), a manufacturer of water and wastewater treatment equipment, seeks review of the denial by the regional administrator of the Environmental Protection Agency (EPA) of protests filed in connection with approved grants for the construction of sewage treatment plants in Charlottesville, Virginia, (the Rivanna project), and Seaford, Delaware (the Seaford project).[1] Both complaints allege procedural irregularities in the processing of the NHS protests as well as substantive violations of portions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, 1281, 1284 (1976 & Supp. I 1977) and the regulations promulgated thereunder, 40 C.F.R. §§ 35.900 to .970 (1979). In addition to declaratory relief, NHS initially requested that the regional administrator be both enjoined from disbursing funds under the two grants and required to direct the grantees Rivanna and Seaford to resolicit bids for their respective projects. NHS subsequently amended both complaints in response to the administrator's contention that the grantees were indispensable to the respective suits. Each amended complaint now prays for a declaration that the administrator's denial of the NHS protest was contrary to the statute and regulations, and for an injunction against future violations. The administrator has moved to dismiss, arguing alternatively (1) that the respective grantees are indispensable parties and (2) that the court lacks subject matter jurisdiction. The two actions have been consolidated by stipulation for the limited purpose of ruling on the motions to dismiss. For the reasons stated hereafter, I conclude that the actions are moot and that the complaints must be dismissed.

## I. THE BACKGROUND OF THE ACTIONS

### A. *The Rivanna Project*

In July or August 1978, after having received an EPA grant for the construction of a water pollution control facility,[2] the Rivanna Water and Sewer Authority (Rivanna) of Charlottesville, Virginia, advertised the project for public bidding. Shortly thereafter, NHS requested and received a complete set of the construction plans and specifications which had been approved by the EPA regional administrator prior to the solicitation of public bids. *See generally* 40 C.F.R. §§ 35.920–3(c), .935–1, .935–2. Upon examining the specifications, NHS discovered that for particular items of equipment, certain manufacturers had received Rivanna's specific approval and were so designated in the specifications. NHS was not among the approved suppliers. The specifications required that bidders who wished to use the equipment of nondesignated manufacturers supply additional data about the equipment as well as a warranty bond. In addition, bidders using nondesignated equipment had to "bear the cost of any structural, electrical, mechanical or process alterations or changes required by use of [such equipment]." Amended Complaint (Document No. 10) ¶ 11.

After having lodged informal complaints about the specifications with both Rivanna and the EPA, NHS filed a formal protest with Rivanna on August 22, 1978. The protest alleged that the specifications were unjustifiably exclusionary and discriminatory, and therefore violative of the express intent of Congress in implementing the grant program (as articulated in 33 U.S.C. § 1284(a)(6) (1976)) and of EPA regulations

---

1. Civil Action No. 78–3040 arises out of a grant agreement between the regional administrator and the Rivanna Water and Sewer Authority for the construction of a water pollution control facility in Charlottesville, Virginia. Civil Action No. 79–495 arises out of a grant agreement between the administrator and the City of Seaford for the construction of a sewage treatment plant in Seaford, Delaware.

2. The grant was awarded under the program authorized by section 201 of the Federal Water Pollution Control Act, 33 U.S.C. § 1281 (1976 & Supp. I 1977). The grant agreement provided that the federal government would fund approximately 75% of the eligible costs of construction. Amended Complaint (Document No. 10) ¶ 5.

(specifically 40 C.F.R. § 35.936–3, –13 (1979)). Rivanna issued an addendum to the specifications on August 31, 1978. By letter dated September 1, 1978, Rivanna acknowledged the NHS protest and directed NHS to submit its arguments by September 15, 1978. On September 7, 1978, Rivanna received the bids as solicited; on September 15, 1978, NHS filed its written arguments as directed; on September 22, 1978, Rivanna rejected the NHS protest and awarded the construction contract to the low bidder. On September 29, 1978, NHS petitioned the EPA regional administrator for review of Rivanna's denial of the protest; the Rivanna decision was affirmed by defendant Schramm on November 2, 1978. NHS filed this action for review of the administrator's determination on December 1, 1978.

### B. *The Seaford Project*

The City of Seaford, Delaware, which had received an EPA grant to improve its wastewater treatment plant, solicited public bids for the project in September 1978. NHS requested and received a complete set of the construction plans and specifications that had previously been approved by the EPA. These specifications required that within certain equipment categories nondesignated suppliers or manufacturers either "have ten years experience in design and operation, or give an undertaking to supply a ten-year performance bond." Amended Complaint (Document No. 6) ¶ 10(A). Bidders who wished to use the equipment of unnamed manufacturers did so at their risk. Moreover, Seaford could, prior to awarding the contract, require the bidder to substitute the equipment of a designated supplier for that of the unnamed manufacturer listed in the bidder's proposal. A bidder who failed to comply with Seaford's substitution would forfeit the bid security. Finally, the bidder had twenty-one hours after the opening of bids to submit additional data so that Seaford's engineer might determine whether the equipment listed in the bid complied with the project specifications.

On September 22, 1978, NHS filed a formal protest with Seaford, alleging that the specifications were discriminatory and exclusionary in violation of the Federal Water Pollution Control Act and EPA regulations. Seaford did not respond to the NHS protest; Seaford did, however, issue an addendum to the specifications, which reduced the experience or bond requirement to five years and expanded the time for submission of additional data to 48 hours. NHS received the addendum on October 2, 1978; the bids were opened on October 3, 1978. On October 6, 1978, NHS filed an appeal with the regional administrator, advancing in addition to the complaints that had been presented in the protest to Seaford the charge that the timing of the addendum did not afford the bidders sufficient reaction time. The regional administrator affirmed the Seaford procurement action in a determination issued on January 8, 1979, rejecting NHS' claim of discriminatory specifications and holding that NHS lacked standing to complain of the timing of the addendum. Amended Complaint (Document No. 6) Exhibit B. Seaford subsequently awarded the contract to the low bidder. NHS filed this action for review of the administrator's determination on February 7, 1979.

### II. THE MOTION TO DISMISS

As I have already noted, the administrator advances in each case two arguments in support of his motion to dismiss: (1) the failure to join an indispensable party (namely, the grantee) and (2) the lack of a justiciable controversy. I will address each argument in turn.

### A. *The Indispensability Concerns*

■ The administrator argues that the grantee's central role in the administration of the grant program—specifically its responsibility for formulating project plans and in initially processing protests to the specifications—renders it indispensable to an action, like those here, that challenges the specifications as discriminatory and violative of the regulations. I cannot agree with the conclusion urged by the adminis-

trator, although his contention would have had considerable appeal had plaintiff not amended its complaints. Each action, however, now challenges not so much the particular set of specifications as it does the administrator's interpretation of the EPA regulations, which permits specifications of this type to stand. Under my reading of the complaints, the most that can be said, from each grantee's authorship of the specifications for its project and from its rejection of the NHS protest, is that the grantee has an interest in the subject matter of the action. *See generally* Fed.R.Civ.P. 19(a)(2).

While, as defendant argues, the joinder of all interested parties may be desirable, the identification of the grantees' interest does not in and of itself answer the question of their indispensability to the respective actions. At most, *and* if the grantees are so situated that permitting the actions to proceed in their absence will "as a practical matter impair or impede [their] ability to protect [their] interest[s]," [3] the recognition of the grantees' interest simply provides the key into subsection (b) of Rule 19, which outlines the factors that are ultimately determinative of indispensability. I will assume for present purposes that the grantees satisfy the requirements of Rule 19(a)(2), and analyze the question of their indispensability against the Rule 19(b) criteria.

The Rule 19(b) framework includes consideration of the following factors: (1) the prejudicial impact of a judgment rendered in the grantee's absence, (2) the extent to which the form of relief might minimize or avoid such prejudice, (3) the adequacy of a judgment rendered in the grantee's absence, and (4) the availability of an adequate remedy for plaintiff in the event of dismissal. Fed.R.Civ.P. 19(b). When gauged against these criteria, the adminis-

trator's argument that the grantees are indispensable to the respective suits fails.

Only the last of the four factors set out above counsels dismissal of these actions. As defendant has repeatedly emphasized, NHS can obtain all the relief that it had originally requested by suing Seaford and Rivanna in the appropriate district courts and by joining the administrator, who is amenable to process throughout region III, in each of those actions. The availability of an alternative forum and the relative ease of suit in that forum, however, cannot overcome the negative weight of the first three Rule 19(b) factors. The administrator cannot escape the fact that plaintiff no longer prays for relief that would require a resolicitation of bids or that would in any way interfere with the construction of the treatment plants. The amended complaint would therefore appear to shortcircuit the argument for dismissal based on the other Rule 19(b) considerations.

■ Citing section 35.939(e)(5) of the EPA regulations,[4] the administrator nevertheless suggests that a determination adverse to him would redound to the grantees' disadvantage. The administrator intimates that he would be compelled to withhold the funds that have already been committed to these projects should I declare his determinations upholding the specifications to have been in violation of the statute and regulations. I do not read section 35.939(e)(5) to require so drastic a result as subjecting a grantee, which contracted for the construction of its water pollution control project after the administrator had approved the project specifications a second time by affirming that grantee's denial of a protest, to loss of the funding necessary to meet its contractual commitments. In my view, the regulation simply requires (con-

---

**3.** Rule 19(a)(2) provides for the joinder of a person who "claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or

otherwise inconsistent obligations by reason of his claimed interest."

**4.** "If a determination is made by the Regional Administrator, which is favorable to the complainant, the grantee's procurement action (for example, contract award) must be taken in accordance with such determination." 40 C.F.R. § 35.939(e)(5) (1979).

sistent with the two-tier scheme of review that reposes with the administrator the authority to determine whether the grantee's action comports with the regulations) that the grantee must proceed in accordance with the administrator's decision. Both Rivanna and Seaford complied with the requirements of section 35.939(e)(5). Seaford awarded its construction contracts after the administrator had rejected the NHS protest. Although Rivanna's contract award was made before the administrator had reviewed the NHS protest, the Rivanna action was subsequently approved by the administrator and can be said to have been "taken in accordance with such determination." I therefore reject the administrator's argument that section 35.939(e)(5) presents a potential source of prejudice to the grantee.

The administrator has not pointed to any other statutory or regulatory provision that would either compel or permit him unilaterally to cut off funding to a grantee which has incurred substantial contractual commitments in reliance on the administrator's erroneous decision and which is currently discharging its duties in a manner that is consistent with the statutory and regulatory scheme. In addition, I cannot accept the unarticulated contention implicit in the argument that prejudice to the grantee warrants dismissal of these actions—namely, that the court cannot fashion its decree to obviate any prejudicial fall-out to the grantee. If, for example, plaintiff were seeking here a resolicitation of bids and if the grantees were properly before me, I might, as a court of equity, determine that although the specifications were clearly discriminatory and the denial of plaintiff's protest by the grantee and the administrator therefore unjustifiable, the economic and environmental costs of interrupting and further delaying the plant construction far outweigh any benefit to the plaintiff. If I could, in my discretion, refuse to grant the relief requested under the circumstances just outlined, I see no reason why I cannot in this action for equitable relief similarly insulate the grantee from any prejudicial consequences that might flow from this suit, particularly where I have before me the party charged with overseeing the administration of the grant program and to whom the grantee is answerable, namely, the regional administrator. Accordingly, I will deny defendant's motions to dismiss insofar as the administrator relies on Rule 19.

## B.  *The Mootness Concerns*

The administrator's second argument in support of his motions to dismiss is a logical corollary of the first. He contends that without the grantees, there is no case or controversy for the court to adjudicate. The administrator's argument is two-fold. First, a declaration that the regional administrator's decisions were erroneous would have no practical effect upon plaintiff, and the controversies with respect to the past actions of the administrator in the Seaford and Rivanna protests are therefore moot. Second, insofar as the actions seek declaratory and injunctive relief against future violations, there has been no threat that the administrator is about to act contrary to the regulations nor is there an adequate factual basis for an adjudication; the cases are therefore not yet ripe for review.

The administrator's argument has considerable merit, and despite my inability to accept one of his basic premises, I agree that these actions must be dismissed. Both plaintiff and defendant have relied upon the constitutional and prudential considerations of the mootness and ripeness doctrines in structuring their arguments. Although the principles of these double-stranded doctrines are relatively easy to state, their application is no easy task under the best of circumstances. *See generally* 13 C. Wright & A. Miller, Federal Practice and Procedure §§ 3532, 3533 (1975); Note, *The Mootness Doctrine in the Supreme Court*, 88 Harv.L. Rev. 373 (1974). Here, the parties' selective and very discriminate intermingling of the doctrinal principles has made even more difficult the task of unraveling and evaluating their antagonistic arguments.

Defendant isolates the prayer for injunctive relief from the request for declaratory

judgment and the facts giving rise to the present action. He then makes a conclusory argument that the case is moot with respect to declaratory relief relating to the Rivanna and Seaford specifications. This argument, if accepted, leaves plaintiff with an action for injunctive and forward-looking declaratory relief. Inasmuch as the factual allegations that have prompted plaintiff to resort to the court reveal neither a continuing impact upon NHS as a result of the administrator's allegedly erroneous interpretation nor an immediate prospect of similar harm, the administrator contends that there is no factual predicate for the injunctive and declaratory relief sought and that the actions are, therefore, not ripe for review.

The administrator's argument appears to be logically and legally unassailable. It is also deceptively simplistic, for the mootness contention, which is the cornerstone of the argument, is grounded exclusively in Article III and fails to address the prudential considerations that guide the application of the mootness doctrine. The administrator does not assess the question of future harm—and the propriety of injunctive and forward-looking declaratory relief—from the perspective of the mootness doctrine. Yet, assuming an Article III controversy, analysis of the aforementioned issue—*i. e.*, whether the possibility of future harm justifies a present adjudication—may lead to a different result under the prudential strand of the mootness doctrine than would analysis under the ripeness doctrine.

■ The ripeness inquiry, on the one hand, revolves around two questions: whether the issues are fit for judicial review and whether my refusing to consider the issues will result in hardship to the parties. *See, e. g., Exxon Corp. v. F. T. C.,* 588 F.2d 895, 901 (3d Cir. 1978) (applying the principles enunciated in the *Abbott* trilogy[5]). Focusing on the second prong of the ripeness test, I might conclude (1) that although the facts as alleged clearly demonstrate a past injury to plaintiff, the administrator's determination has no present impact upon plaintiff that would be cured by present declaratory or injunctive relief, and (2) that the threat of future injury is not sufficiently immediate or simply too speculative to warrant the relief presently requested. The contingency of future harm and the absence of present detriment could well prompt the conclusion that refusing to entertain the actions at this time will not disadvantage the parties, and that the actions are not ripe for review.

■ On the other hand, the critical concern in an analysis under the prudential strand of the mootness doctrine is whether the challenged action is "capable of repetition, yet evading review." *See Southern Pacific Terminal Co. v. I. C. C.,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Dow Chemical Co. v. E. P. A.,* 605 F.2d 673 (3d Cir. 1979). Viewed from this perspective, the lack of present or continuing impact and the speculative nature of future harm—the same factors that would counsel dismissing the actions as unripe—may carry very little weight if the future injury "will evade review." And I may conclude, as a consequence of this latter factor, that the policy considerations which underlie the mootness doctrine point to a present determination of the questions presented by these actions.

Because, as I have earlier stated, I agree with the administrator that these actions must be dismissed, the problem that I have just outlined of manipulating the applicable principles to reach a particular result is more academic than real. Nevertheless, I have made the foregoing comments to illustrate that the argument for dismissing these actions is not as clearcut as defendant would suggest. In my view, a thorough analysis of the question raised by the motions to dismiss is one that considers the complaint in its entirety—*i. e.*, the prayer for both injunctive and declaratory relief in conjunction with the factual allegations—from the standpoint of both the prudential

---

5.   *Abbott Lab. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (*Abbott I*); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (*Abbott II*); *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967) (*Abbott III*).

and the constitutional strands of the mootness doctrine as well as the ripeness doctrine. Consequently, although the administrator and I arrive at the same conclusion, our analyses differ.

Our principal point of departure is in the contention that these actions do not meet the case or controversy requirement of Article III. The Court of Appeals for the Third Circuit has recently restated the considerations that have been identified by the Supreme Court as relevant to the Article III inquiry:

(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy with sufficiently adverse parties so as to sharpen the issues for judicial resolution.

Dow Chemical Co. v. EPA, supra, 605 F.2d at 678.

■ While I concede that it is a close question, I believe that these actions reach the constitutional threshold. NHS has twice presented to the administrator protests about similarly restrictive specifications, both of which had received the administrator's prior approval, charging that the specifications were violative of specific regulations. In both instances, the administrator rejected the protests. The controversy to be resolved is thus real and not hypothetical. NHS and the administrator obviously differ about the requirements of the regulations here challenged and I have no concern about sufficient adversariness. Even though it ·has foregone its requests that the Rivanna and Seaford projects be rebid, NHS, as a supplier of equipment used in the construction of wastewater treatment plants, has an interest in ensuring that it is not disadvantaged in future bidding as it has been in the past. Both sets of specifications that have been held by the administrator to be consistent with the regulations named suppliers other than NHS and imposed additional obligations upon bidders who chose to use nondesignated suppliers. A declaration that the Rivanna and Seaford specifications are unduly restrictive and therefore forbidden by the regulations, coupled with an injunction against future use of specifications of this type, would enable NHS to compete on an equal footing with other suppliers of water pollution control equipment. There thus exists, under the test outlined above, an Article III controversy.

■ Looking into the policy concerns that determine whether an action is moot or unripe, however, I conclude that the motions to dismiss must be granted. A crucial consideration in the mootness inquiry is whether the administrator will approve similar allegedly discriminatory specifications for a future project under circumstances that will evade review. Plaintiff argues that the administrator's approval of similarly restrictive specifications in the Rivanna and Seaford projects presages his future course of conduct. Defendant counters this contention with the argument that plaintiff has neither identified future projects on which it plans to bid nor demonstrated that the administrator will act contrary to the regulations should he again be presented with a protest alleging discriminatory specifications.

Reduced to its bare essentials and phrased in terms of the mootness doctrine, this argument suggests that plaintiff has failed to show that the challenged activity is "capable of repetition." I cannot agree with the administrator on this score. It appears to me that unless the grant program authorized by section 201 of the Federal Water Pollution Control Act, 33 U.S.C. § 1381 (1976 & Supp. I 1977), is to come to a complete standstill in this region (and defendant does not suggest such a possibility), there will undoubtedly be future projects that will require equipment of the same type as plaintiff's. Moreover, I see no reason to assume that the administrator will apply the regulations in a manner that is inconsistent with his past interpretations. He certainly has not suggested that he will. Given the nature of the grant program and the administrator's articulated stance vis-a-vis the regulations upon which plaintiff relies, there is at least a possibility that plain-

tiff will again experience the same injury of which it now complains.

The second element of the mootness inquiry—whether the issue now sought to be adjudicated will evade review—is somewhat more problematic. Future injury of the type alleged here cannot be said to evade review because of the availability of the administrative protest procedures and of judicial review subsequent thereto. NHS nevertheless argues that the timing of events under the administrative scheme carries the potential for future prejudice, which counsels against dismissal of these actions as moot. As I interpret its argument, NHS fears that although the regulatory scheme delays the award of the construction contract during the pendency of the administrative process, the construction will usually be well underway by the time the merits of the protest are resolved by the court, and that a successful protestant will have only a pyrrhic victory because of the court's reluctance to interfere with or further delay the construction of a costly and environmentally beneficial project. Plaintiff contends that in all probability the only viable relief will be exactly that which it seeks here—a declaration that the challenged action was contrary to the regulations and an injunction against future violations. Plaintiff concludes, therefore, that in the process of securing review of this new but similar injury, it will have been foreclosed from competing on an equal footing with more established suppliers for yet another project.

Although there is a degree of validity to plaintiff's complaint of future prejudice without effective judicial review, I am unpersuaded by its argument. The NHS scenario ignores the availability of preliminary injunction and the possibility of an expedited hearing on the merits. Of course, there is always the chance that concern for the expense attendant to any delay in the construction of a project may militate against the grant of preliminary relief. However, I am not prepared to assume that that interest will always hold sway should plaintiff make the requisite showing for preliminary injunction. I therefore conclude that the circumstances presented by the instant actions do not fall within the category of actions that will evade review.

Other policy considerations also dictate dismissal of these actions. Plaintiff suggests that the public interest will be advanced because a present adjudication will promote competition in future projects. Defendant, on the other hand, raises the specter of the sewage plant projects coming to a halt in this region because the administrator might defer ruling on protests involving specifications of the type at issue here (thereby delaying the construction contract awards) during the pendency of an appeal from my ruling, should I determine the question adversely to him. When these public interest concerns are balanced against each other, the future progress of sewage plant construction, which is the essential purpose of the legislation, must take precedence over the secondary goal of encouraging competition in the sewage treatment industry. Even if I were to weight these competing public interest concerns differently, the beneficial effect on competition would not, in my view, be a sufficiently compelling reason under the circumstances presented here to decide an otherwise moot question.

Attempting to overcome the administrator's lack-of-ripeness argument, plaintiff analogizes to the cases approving pre-enforcement review of agency action. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). *See generally* K. Davis, Administrative Law of the Seventies 158–67 (1976); 13 C. Wright & A. Miller, Federal Practice and Procedure § 3532 (1975). NHS argues that the administrator's failure to comply with the statute and regulations, as evidenced in his approval of the Seaford and Rivanna specifications, has affected NHS' ability to compete on an equal footing with other suppliers, and that these actions seek to vindicate what NHS has termed its "present interest" in ensuring that it is not at a competitive disadvantage in the future.

Plaintiff's reliance on the "pre-enforcement review" cases is unavailing. As I

have earlier stated, the relevant inquiry is the fitness of the issues for judicial review and the hardship to the parties of refusing to decide the questions presented. Plaintiff fails on both scores. Despite NHS' averral of a present interest in ensuring that the administrator abides by the requirements of the statute and the regulations, I must agree with the administrator that his decisions upholding the Rivanna and Seaford specifications have no present effect on NHS.

More importantly, however, I believe that the issues sought to be adjudicated do not easily lend themselves to declaratory or injunctive relief that will have the desired future utility. The relevant statute [6] and regulation [7] do not speak in absolute terms. Rather, they appear to afford the grantee some leeway in formulating its specifications. Although the controversies presently before me are in several respects similar, their factual differences create considerable concern. These differences be-

speak potentially wide-ranging variations in future specifications, and it appears, to me at least, an almost impossible task to anticipate—and to fashion an order that will circumvent—all the conceivable permutations. Consequently, because the issues presented by these complaints do not appear to be susceptible of an effective yet practical order, I can only conclude that the complaints are not ripe for review insofar as they seek to vindicate plaintiff's so-called "present interest" in obviating future prejudice.

The lack of a present impact, the difficulty of fashioning an effective prospective decree, and the availability of judicial review for future violations counsel dismissal of these actions. I will enter an appropriate order.

6. Section 204(a)(6) of the Federal Water Pollution Control Act, 33 U.S.C. § 1284(a)(6) (1976), provides:

no specification for bids in connection with such works shall be written in such a manner as to contain proprietary, exclusionary, or discriminatory requirements other than those based upon performance, unless such requirements are necessary to test or demonstrate a specific thing or to provide for necessary interchangeability of parts and equipment, or at least two brand names or trade names of comparable quality or utility are listed and are followed by the words "or equal".

7. Section 35.936–13 of the EPA regulations provides in pertinent part:

(a) *Nonrestrictive specifications.* (1) No specification for bids or statement of work in connection with such works shall be written in such a manner as to contain proprietary, exclusionary, or discriminatory requirements other than those based upon performance, unless such requirements are necessary to test or demonstrate a specific thing or to provide for necessary interchangeability of parts and equipment, or at least two brand names or trade names of comparable quality or utility are listed and are followed by the words "or equal." If brand or trade names are specified, the grantee must be prepared to identify to the Regional Administrator or in any protest action the salient requirements (relating to the minimum needs of the

project) which must be met by any offeror. . . .

(b) *Sole source restriction.* A specification shall not require the use of structures, materials, equipment, or processes which are known to be available only from a sole source, unless the Regional Administrator determines that the grantee's engineer has adequately justified in writing that the proposed use meets the particular project's minimum needs or the Regional Administrator determines that use of a single source is necessary to promote innovation (see § 35.908). . . .

(c) *Experience clause restriction.* The general use of experience clauses requiring equipment manufacturers to have a record of satisfactory operation for a specified period of time or of bonds or deposits to guarantee replacement in the event of failure is restricted to special cases where the grantee's engineer adequately justifies any such requirement in writing. Where such justification has been made, submission of a bond or deposit shall be permitted instead of a specified experience period. The period of time for which the bond or deposit is required should not exceed the experience period specified. No experience restriction will be permitted which unnecessarily reduces competition or innovation. . . .
40 C.F.R. § 35.936–13(a)(1), (b), (c) (1979).