536 F.2d 156
 8 ERC 2114, 6 Envtl. L. Rep. 20,486
 BETHLEHEM STEEL CORPORATION, Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.
NATIONAL STEEL CORPORATION, Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.
CITY OF EVANSVILLE, INDIANA, Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY, and Russell Train,
Administrator, Respondents.
PUBLIC SERVICE COMPANY OF INDIANA, INC., Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.
NORTHERN INDIANA PUBLIC SERVICE COMPANY, Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.
INDIANAPOLIS POWER & LIGHT COMPANY, Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 75-1568, 75-1569, 75-1590, 75-1600 to 75-1602.
 United States Court of Appeals,
Seventh Circuit.
 Heard Jan. 21, 1976.
Decided May 10, 1976.
 
 Peter G. Veeder, Pittsburgh, Pa., Daniel Joseph, Washington, D. C., Jerry P. Belknap, Bryan G. Tabler, Indianapolis, Ind., John C. Berghoff, Jr., Chicago, Ill., Stephen R. Appel, Evansville, Ind., Charles W. Campbell, Greg K. Kimberlin, Plainfield, Ind., Arnold A. Gordus, Marcus E. Woods, Indianapolis, Ind., for petitioners.
 Peter R. Taft, Asst. Atty. Gen., Paul M. Kaplow, Atty., Dept. of Justice, Richard G. Stoll, Jr., Atty., Environmental Protection Agency, Washington, D. C., for respondents.
 Before SWYGERT and BAUER, Circuit Judges, and HOFFMAN, Senior District Judge.*
 BAUER, Circuit Judge.
 
 
 1
 The petitioners challenge on several grounds the designation by the Environmental Protection Agency ("EPA") under the Clean Air Act (42 U.S.C. § 1857 et seq.) ("the Act") of certain areas in Indiana as "air quality maintenance areas" ("AQMA's"). The EPA asks us to dismiss the petitions on the grounds that the challenged agency action is not ripe for review, that the petitioners lack standing to sue, and on the merits of the challenge. We dismiss the petitions on the issue of ripeness.
 
 I.
 
 2
 Under § 109 of the Clean Air Act, EPA is to promulgate national primary and secondary ambient air quality standards to protect the public health and welfare. Under § 110 of the Act, the states are required to adopt and submit to the EPA plans which provide for the implementation, maintenance and enforcement of the national primary and secondary standards. Under § 110(a)(2) (B), state plans are to include:
 
 
 3
 "(B) . . . emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary (national ambient air quality) standard, including, but not limited to, land-use and transportation controls."
 
 
 4
 Under § 110(a)(2) the EPA is to approve or disapprove state plans on the basis of whether the state plan is in accordance with the requirements of § 110(a) (2), including § 110(a)(2)(B) quoted above. Under § 110(c), the EPA may promulgate a plan for a state when the state has failed to submit a plan to the EPA or has submitted a plan which is not in accordance with the requirements of § 110(a)(2).
 
 
 5
 In Natural Resources Defense Council v. Environmental Protection Agency, 154 U.S.App.D.C. 384, 475 F.2d 968 (1973), the court ordered the EPA to review the adequacy of all state implementation plans to ascertain whether the plans contained measures necessary for maintenance of the national standards. On March 8, 1973, 38 Fed.Reg. 6279 et seq., the EPA disapproved all state implementation plans for failing to contain adequate regulations or procedures for maintenance of national standards.
 
 
 6
 On June 18, 1973, the EPA published regulations setting forth the requirements and procedure for states to follow in developing air quality maintenance provisions in their implementation plans; to wit:
 
 
 7
 "(e) The plan shall identify those areas (counties, urbanized areas, standard metropolitan statistical areas, et cetera) which, due to current air quality and/or projected growth rate, may have the potential for exceeding any national standard within the subsequent 10-year period.
 
 
 8
 (1) For each such area identified, the plan shall generally describe the intended method and timing for producing the analysis and plan required by paragraph (g) of this section.
 
 
 9
 (2) The area identification and description of method and timing required by this paragraph shall be submitted no later than 9 months following the effective date of this paragraph.
 
 
 10
 (3) At 5-year intervals, the area identification shall be reassessed to determine if additional areas should be subject to the requirements of paragraph (g) of this section.
 
 
 11
 (f) Based on the information submitted by the States pursuant to paragraph (e) of this section, the administrator will publish, within 12 months of the effective date of this paragraph, a list of the areas which shall be subject to the requirements of paragraph (g) of this section.
 
 
 12
 (g) For each area identified by the administrator pursuant to paragraph (f) of this section, the State shall submit, no later than 24 months following the effective date of this paragraph, the following:
 
 
 13
 (1) An analysis of the impact on air quality of projected growth and development over the 10-year period from the date of plan submittal.
 
 
 14
 (2) A plan to prevent any national standards from being exceeded over the 10-year period from the date of plan submittal. Such plan shall include, as necessary, control strategy revisions and/or other measures to insure that projected growth and development will be compatible with maintenance of the national standards throughout such 10-year period. * * *
 
 
 15
 (h) Plans submitted pursuant to paragraph (g) of this section shall be reanalyzed and revised where necessary at 5-year intervals." 40 C.F.R. § 51.12e-h, 38 Fed.Reg. 15836.
 
 
 16
 After the State of Indiana failed to submit its own AQMA designations within the time limit imposed by the EPA, the EPA exercised its authority under Section 110(c) of the Clean Air Act and issued its own designations. 40 C.F.R. 52.792 (June 2, 1975).
 
 
 17
 Petitioners challenge both the 1973 air quality maintenance regulations recited above and the particular designations of Porter, Floyd, Marion and Vanderburgh Counties in Indiana as AQMA's.
 
 
 18
 As to the 1973 regulations, the steel and power company petitioners argue that they should be set aside since they were not promulgated in compliance with the procedural safeguards required by Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553. In addition, the power companies, joined by the City of Evansville, argue that the regulations are invalid since they are not authorized by the Clean Air Act or, if they are found to be authorized by the Act, they constitute an unconstitutional exercise of federal power.
 
 
 19
 All the petitioners challenge on substantive grounds the designations of the particular Indiana counties as AQMA's.II.
 
 
 20
 The EPA raises the issue of whether we should review the validity of the air quality maintenance program and the designation of particular counties as AQMA's now, after the initial designations of AQMA's by the EPA but before the specific maintenance plans are formulated, or defer our consideration until the specific plans are formulated and the petitioners are subject to sanctions for their noncompliance with the control measures which will be included in the plan.
 
 
 21
 Evansville and the power companies argue that we need not reach this ripeness question since this action is brought under § 307(b)(1) of the Clean Air Act which compels us to review these issues now regardless of their ripeness for review. We disagree. Section 307(b)(1) pertains to the existence of judicial review and the appropriate forum for review, not the timing of review.
 
 
 22
 The language of the provision does not suggest that it does more than provide for judicial review and an appropriate forum:
 
 
 23
 ". . . a petition for review of the Administrator's action in approving or promulgating any implementation plans under section (110 of this Act) or section (111 of this Act) may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation, approval, or action, or after such date if such petition is based solely on grounds arising after such 30th day."
 
 
 24
 Our review of the legislative history does not suggest the contrary. The conference report on the provision states only that its purpose is to ". . . specif(y) the courts in which certain appeals may be prosecuted . . . ." Conf.Rep. No. 91-1783, 3 Cong. & Admin.News 1970, p. 5389. See also S.Rep. No. 91-1196, 91st Cong. 2d Sess. 40-41 (1970).
 
 
 25
 Finally, while not ruling directly on the point, at least two circuits have dismissed suits brought under Section 307(b)(1) on ripeness grounds. Kennecott Copper Corp. v. EPA (10th Cir., No. 75-1463, March 18, 1976); Buckeye Power, Inc. v. EPA, 525 F.2d 80 (6th Cir. 1975). And at least two circuits have ruled that Section 307(b)(1) does not automatically confer standing. National Resources Defense Council v. EPA, 507 F.2d 905, 908-911 (9th Cir. 1975); Natural Resources Defense Council v. EPA, 481 F.2d 116, 120-121 (10th Cir. 1973).
 
 
 26
 Having disposed of this threshold question, we can deal with the ripeness issue. The Supreme Court succinctly stated the relevant considerations behind the ripeness doctrine as applied in the context of reviewing administrative agencies' decisions in Abbott Laboratories v. Gardner, 387 U.S. 136, 148-149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967):
 
 
 27
 "(I)t is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."
 
 
 28
 The Court went on to articulate a methodology for applying the doctrine in a particular case.
 
 
 29
 "The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."
 
 
 30
 The determination to be made is the imprecise one of considering and balancing the relevant factors. It is "very much a matter of practical common sense", Continental Air Lines, Inc. v. C. A. B., 522 F.2d 107, 124 (D.C.Cir. 1975).
 
 
 31
 A. Fitness of Issues for Judicial Resolution.
 
 
 32
 In determining whether the issues are fit for judicial resolution, we must first look to whether they are sufficiently concrete at this time "to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies", Abbott Laboratories v. Gardner,supra, 387 U.S. at 148, 87 S.Ct. at 1515, 18 L.Ed.2d at 691.
 
 
 33
 The issues raised in the instant case by the petitioners are either " purely le- gal"[1]: whether the Clean Air Act and the Constitution authorize the June 1973 regulations; or concern completed matters: whether the June 1973 regulations were issued in compliance with the Administrative Procedure Act and whether the particular AQMA designations were substantively correct. These issues will not be clarified if review is delayed since there is no further factual development which can occur. Thus they are sufficiently concrete for our review at this time.
 
 
 34
 We must next consider whether the challenged agency action is "final". If it is not, we must postpone our review in order "to protect the agencies from judicial interference until an administrative decision has been formalized", Id. at 148, 87 S.Ct. at 1515, 18 L.Ed.2d at 691.
 
 
 35
 As the Supreme Court said in Abbott Laboratories, Id. at 149, 87 S.Ct. at 1516, 18 L.Ed.2d at 692, "The cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." The Court went on to distinguish prior cases in which agency action was found to be not final and to explain why the action in the case at hand was final:
 
 
 36
 "The regulation challenged here, promulgated in a formal manner after announcement in the Federal Register and consideration of comments by interested parties is quite clearly definitive. There is no hint that this regulation is informal, see Helco Products Co. v. McNutt, 78 U.S.App.D.C. 71, 137 F.2d 681, 149 A.L.R. 345, or only the ruling of a subordinate official, see Swift & Co. v. Wickham, D.C., 230 F.Supp. 398, 409, aff'd, 2 Cir., 364 F.2d 241, or tentative. It was made effective upon publication, and the Assistant General Counsel for Food and Drugs stated in the District Court that compliance was expected." 387 U.S. at 151, 87 S.Ct. at 1517, 18 L.Ed.2d at 693.
 
 
 37
 Like the regulation challenged in Abbott Laboratories, the challenged EPA regulations in the instant case were "promulgated in a formal manner"[2] and can be considered "definitive." Unlike the agency action in Abbott Laboratories, no compliance by the petitioners is expected. The regulations in question only provide for a study by the State of Indiana of future air pollution problems in the designated areas. Any standards for petitioners to follow will not be promulgated until the study is completed. Our review of the challenged actions consequently will interfere with an ongoing administrative process. Because of this we cannot say the agency action is "final".
 
 
 38
 Thus, the issues here are fit for judicial review in the sense that they present concrete legal questions, but are not fit for judicial review in the sense that the actions challenged are part of a continuing agency decision-making process which has not yet resulted in an order requiring compliance by the petitioners.
 
 
 39
 B. Hardship to the Parties.
 
 
 40
 The absence of a final agency decision, which militates against our presently reviewing the challenges, must be weighed against the hardship to the petitioners of denying review at this time.
 
 
 41
 The EPA designations are merely a listing of areas for further study by the states; the petitioners are not required to do anything nor to refrain from doing anything. In the future, after the states complete their studies, petitioners may be required to comply with air quality standards set by the state or the EPA. This possibility[3] of future injury is not sufficient to warrant our review of the designations.
 
 
 42
 Recognizing this situation, the petitioners argue that they are suffering present injury as a result of the designations. The steel companies claim that the designation of Porter County as an AQMA causes uncertainty in their business operations since capital must be maintained to cover the possible expenditure of funds for pollution control equipment required to meet more restrictive air pollution regulations.
 
 
 43
 Similarly, the power companies claim that the designations affect the certainty of their capital planning since they must set aside funds to cover possible expenditures for additional air pollution control equipment or for a required conversion to less polluting fuels. In addition, they claim the designations will affect the economic growth of the companies' service areas, a factor which likewise must be taken into account in the companies' current capital planning. Pointing to a more concrete effect, the power companies tell us that they have been required by the Securities and Exchange Commission to disclose the existence of the EPA designations and their potential adverse effects on the companies in prospectuses for securities they are offering for sale to the public. They claim that these disclosures diminish the value of their securities, adversely affecting their present ability to raise capital funds.
 
 
 44
 The City of Evansville claims it is immediately harmed by the designation of Vanderburgh County as an AQMA because it is faced with an unavoidable dilemma. The City has a limited amount of funds earmarked for environmental purposes. These funds currently are being used for local projects. Along with its AQMA designation, the EPA has requested that the City participate in the analysis and planning of air quality management standards for Vanderburgh County.[4] If Evansville is to participate in this study and plan development it claims that it would have to curtail its current environmental projects.[5] If it chooses not to participate, it claims that the study and plan will be inferior to what it could be with their participation.
 
 
 45
 The steel and power companies' claims of uncertainty in their business and capital planning are not sufficient to warrant our review of an ongoing administrative process. First, the claims are vague and speculative. They do not involve injuries on the order of the concrete immediate business costs which the Supreme Court relied on to find a pre-enforcement challenge to administrative action ripe for review in Abbott Laboratories, supra, and Gardner v. Toilet Goods Association, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). In those cases the petitioners were faced with the dilemma of either expending considerable sums of money to comply with the administrative orders affecting them or facing serious penalties for noncompliance accompanied by the stigma of transgressing the law which could affect their goodwill. The petitioners in the instant case are not faced with such a dilemma. They need not expend any funds at this time since there is no administrative directive to which they must comply, nor, of course, do they face any sanctions for noncompliance.
 
 
 46
 Furthermore, the hardship alleged here does not have the "direct effect on the day-to-day business" of the petitioners which the Supreme Court found present in Abbott Laboratories, 387 U.S. at 152, 87 S.Ct. at 1517, 18 L.Ed.2d at 693. The degree of hardship alleged here is more akin to the hardship found to be insufficient to warrant the Court's review in Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), a companion case to Abbott Laboratories. In Toilet Goods the petitioners challenged an EPA regulation calling for the suspension of the FDA certification of manufacturers of color additives who did not give agency employees free access to their facilities, process and formulae. The Court held the case not ripe for review since the challenged regulation did not have a substantial immediate impact on the petitioners and provided for no irremedial adverse consequences in the event of noncompliance. The Court dealt with the absence of sufficient hardship by characterizing the case as not being one "in which primary conduct is affected when contracts must be negotiated, ingredients tested or substituted, or special records compiled." 387 U.S. at 164, 87 S.Ct. at 1524, 18 L.Ed.2d at 702. The hardship to the steel and power companies in the instant case can be characterized in the same manner. No primary conduct is affected by the agency action challenged here. The only effect is on long range capital planning.
 
 
 47
 The other consideration to be taken into account in determining whether there is sufficient hardship to the parties to warrant our review is that of whether the challenged action will be reviewable in the future. If it will not be reviewable later, our review now may be warranted to protect the right of the parties to have the issues heard in court.
 
 
 48
 Clearly the actions challenged here will be reviewable when the states complete their studies and air quality maintenance provisions are added to the state implementation plans. At that time this Court will have jurisdiction to review the propriety of the June 1973 regulations and of the designations of particular areas as AQMA's. See Indiana & Michigan Electric Co. v. EPA, 509 F.2d 839, 845 (7th Cir. 1975); Buckeye Power Co. v. EPA, 481 F.2d 162, 173 (6th Cir. 1973). Furthermore, the petitioners will then encounter sufficient hardship to preclude the denial of review on ripeness grounds since the classic dilemma found in pre-enforcement review cases will be present. They will be met with the choice of either expending considerable sums of money to meet anti-pollution standards or facing penalties and a loss of goodwill for noncompliance.
 
 
 49
 The claim made by the City of Evansville is of a different nature than the claims of the steel and power companies. The City is faced with a difficult and immediate choice as to the allocation of funds earmarked for environmental purposes. However, we are not convinced that the dilemma faced by Evansville is of the type which compels our review.
 
 
 50
 Evansville must decide, as all governmental bodies do routinely, which of several programs it will support with its limited resources. In the instant situation it faces no external sanctions if it should choose not to participate in the air quality study. The claimed loss due to its choice of action will be of the city's own making, not of the EPA. Judicial relief is not appropriate for this type of harm. Any shortage of funds earmarked for environmental purposes should be remedied by appealing to the source of those funds, not to this Court.
 
 
 51
 Furthermore, the City's claim that any air quality maintenance study conducted without its participation will be an inferior product is merely speculative. It resembles the asserted injury found to be insufficient to confer standing in United States v. S. C. R. A. P., 412 U.S. 669, 688-689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254, 270 (1973). There the Court said:
 
 
 52
 "(P)leadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action."
 
 III.
 
 53
 In conclusion, we find these cases not ripe for our review. While they challenge particular administrative actions which have been completed and in that sense are final, the challenged actions are part of an on-going administrative process which has not culminated in a coercive order directed to the petitioners. The petitioners have not alleged direct, immediate harm as a result of the interim order. In light of these factors and the strong national interest in furthering the mandate of the Clean Air Act, judicial action is not warranted at this time; action which would further delay the already prolonged program to develop and maintain an unpolluted environment.
 
 
 54
 PETITIONS DISMISSED.
 
 
 
 *
 The Hon. Julius J. Hoffman, United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation
 
 
 [1]
 See Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967), wherein the Supreme Court held an issue was fit for judicial resolution in part because it was "a purely legal one: whether the statute was properly construed by the Commissioner." Accord, National Automatic Laundry and Cleaning Council v. Schultz, 143 U.S.App.D.C. 274, 280, 443 F.2d 689, 695 (1971)
 
 
 [2]
 All the challenged regulations were published in the Federal Register after notice, comment, and public hearings. The June 1973 regulations were published at 38 Fed.Reg. 15834-37. The AQMA designations were published at 40 Fed.Reg. 23746-56
 
 
 [3]
 It is conceivable that the state studies mandated under 40 C.F.R. 51.12(g) (1) will reveal that the initial EPA designations were erroneous and maintenance programs will not be required for the areas
 
 
 [4]
 Guidelines for Air Quality Maintenance Planning and Analysis, Volume 2: Plan Preparation, at page II-3 reads as follows:
 "Success of the (Air Quality Maintenance Planning) process is dependent on effective coordination and integration of various functional bodies at different levels of government. This process involves the coordination of transportation, land use, environmental, and all other considerations that impact on planning and growth. . . . (A)uthorities responsible for land use, transportation, and other environmental functions must be integrated into the (Air Quality Maintenance Planning) process in order to ensure that all plans are consistent and that the (Air Quality Maintenance Plan) can be implemented successfully. . . .
 To effectively coordinate air quality maintenance activities with other environmental protection and comprehensive planning activities, coordination on the regional to city scale is essential."
 
 
 [5]
 The three projects described by the City as subject to such curtailment are: (1) development of the City's first anti-noise program; (2) development of a new method for disposal of solid wastes to replace sanitary landfills; and (3) cooperation with the United States Army Corps of Engineers in converting Pigeon Creek, a local waterway, from "an open sewer into a pollution free greenbelt". See p. 12 of Petitioner City of Evansville's Memorandum in Opposition to Motion to Dismiss, September 12, 1975