649 F.2d 481
 15 ERC 1288, 10 Envtl. L. Rep. 20,901
 COMMONWEALTH EDISON CO. et al., Plaintiffs-Appellants,
v.
Russell E. TRAIN, as Administrator, Environmental Protection
Agency, Defendant-Appellee,
and
Natural Resources Defense Council, Inc.,
Defendant-Intervenor-Appellee.
 No. 77-1612.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 17, 1978.
Decided Sept. 22, 1980.
 
 A. Daniel Feldman, Douglass W. Cassel, Jr., Chicago, Ill., for plaintiffs-appellants.
 Ronald J. Wilson, Natural Resources Defense Council, Washington, D. C., for defendant-appellee.
 Before FAIRCHILD, Chief Judge, and SWYGERT and PELL, Circuit Judges.
 FAIRCHILD, Chief Judge.
 
 
 1
 This is an appeal from a judgment of the district court dismissing a suit seeking judicial review of regulations promulgated by the Environmental Protection Agency requiring a policy of antidegradation of water quality to be integrated into state water quality control plans. Appellants, ten utility companies, sought declaratory relief on the ground that the antidegradation regulation is invalid on its face and attempted to enjoin its enforcement. The district court dismissed the action, holding that the controversy was not ripe for decision and that the utilities lacked standing. We affirm.
 
 
 2
 * The Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., is a comprehensive statute designed to restore and maintain the nation's waters. To achieve this goal, the National Pollutant Discharge Elimination System (NPDES) permit program has been established to control "point sources" of pollution such as industrial discharges. Every person discharging pollutants from a point source must obtain an NPDES permit and comply with its terms.
 
 
 3
 Several sections of the Act require that individual states enact water quality plans. Section 208, 33 U.S.C. § 1288, provides that states must adopt "areawide waste treatment management planning" which must meet the requirements of § 208(b), 33 U.S.C. § 1288(b). Section 303(e)(1) requires that each state have a "continuing planning process" which will result in the preparation of plans meeting the requirements of section 303(e)(3), 33 U.S.C. § 1313(e)(3). Under § 208(e) of the Act, no discharge permit may be issued if the discharge would conflict with a provision of a plan prepared by a state pursuant to § 208.
 
 
 4
 The EPA has also promulgated regulations to implement the various water quality provisions of the Act, 40 C.F.R. Parts 130 and 131, 40 Fed.Reg. 55334 et seq. One regulation, 40 C.F.R. § 130.17(e),[1] requires each state to adopt an antidegradation policy and specifies a certain minimum criteria which the states must follow. The regulations also provide that any state water quality plan must incorporate the antidegradation policy, 40 C.F.R. § 130.10(b) (2). After a plan has been prepared by a state and approved by a Regional Administrator of EPA, no NPDES permits can be issued which are inconsistent with the plan, 40 C.F.R. § 130.32(c).[2]
 
 
 5
 The utilities own and have under construction generating stations which use water to condense steam after it has passed through the turbines. They also discharge, after treatment, various chemical wastes resulting from plan operation. The generating stations will be able to discharge cooling water or chemical wastes only if they obtain permits for those discharges. The enactment of an antidegradation regulation, the utilities allege, jeopardizes their ability to secure discharge permits under EPA's NPDES permit system for stations whose construction has already begun. The utilities also assert that the antidegradation regulations jeopardize their ability to site and secure permits for generating units that will be needed in the future.
 
 
 6
 The utilities contend that EPA had no power under the Act to promulgate § 130.17, the antidegradation regulation, since the Act does not authorize or contemplate an antidegradation policy. They argue, therefore, that the antidegradation regulation is invalid and its enforcement should be enjoined. They further argue that § 130.32, the regulation extending the permit prohibition to the state's antidegradation policy, is also invalid. The utilities contend that the antidegradation requirements of the regulations emanate from § 303, if authorized at all, and not § 208 and therefore noncompliance with the antidegradation policy cannot be the basis for the denial, pursuant to § 208(e), of an NPDES permit. The EPA and the National Resources Defense Council, as an intervening defendant, assert that the regulation not only is consistent with the stated goal of the Act ("to restore and maintain the chemical, physical and biological integrity of the Nation's waters")[3] but also has a sound statutory basis in numerous provisions of the statute (specifically citing, in addition to sections 208 and 303, sections 106, 305(b), 314, 501, and 516(b)). We do not decide these issues, however, because we conclude that the controversy between these plaintiffs and the Administrator is not yet ripe for review.
 
 II
 
 7
 The district court judge held both that the controversy between the utilities and the EPA was not ripe for judicial review and also that the utilities lacked standing to attack the validity of the regulations. Although we rest our decision on ripeness, we recognize that this is a case in which the concepts of standing and ripeness merge. See, e. g., Warth v. Seldin, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Both concepts recognize that, for both constitutional and prudential reasons, the courts should not attempt to decide cases that do not reflect a current controversy between adverse parties. Thus, whether we discuss whether the utilities " '(have) sustained or (are) immediately in danger of sustaining some direct injury' as a result of the challenged statute or official conduct" (the standing test of O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), quoting Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923)) or whether the regulations "requir(e) an immediate and significant change in the (utilities') . . . conduct of their affairs" (the ripeness test of Abbott Laboratories v. Gardner, 387 U.S. 136, 153, 87 S.Ct. 1507, 1518, 18 L.Ed.2d 681 (1967)) the result is the same.
 
 
 8
 To determine whether a controversy is ripe for review, it is necessary "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The first requirement of this two-part test for ripeness that the issues presented be fit for judicial decision is not met in this case. The regulation does not impose any obligations on utilities. They do not require "an immediate and significant change in the (utilities) . . . conduct of their affairs." Abbott Laboratories, supra at 153, 87 S.Ct. at 1518. Cf. Bethlehem Steel Corp. v. EPA, 536 F.2d 156, 161 (7th Cir. 1976). Rather, the regulation is directed at the states and requires the states to adopt and implement a policy which may or may not result in a coercive order against utilities in the future.[4] It is impossible to determine at this point with any degree of certainty whether the utilities will be injured by future action by the states.
 
 
 9
 The antidegradation regulation specifies minimum criteria which must be included in the state program. There are four major components of the regulation:[5]
 
 
 10
 (1) Existing water uses must be maintained and protected. This is a basic rule applicable to all navigable waters.
 
 
 11
 (2) For high quality waters which "constitute an outstanding National resource" (such as waters in national and state parks) the regulations provide that states should adopt a policy as part of their standards which allows no degradation in such waters.
 
 
 12
 (3) For other high quality waters, the state may allow limited degradation if the state chooses to allow lower water quality as a result of necessary and justifiable economic or social development. Thus a state may allow limited degradation of high quality waters as long as the minimum criteria to support the existing uses (e. g., fishable, swimmable) are maintained.
 
 
 13
 (4) Finally, the antidegradation policy must be consistent with Section 316(a) of the Act. This Section allows thermal dischargers, such as the utilities, to be relieved of temperature limitations whether based upon water quality standards or technology whenever the discharger can demonstrate that less stringent limitations will be sufficient to protect a "balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water." Thus thermal dischargers can avoid any obligations generally required by the antidegradation policy if they can meet the 316(a) test.
 
 
 14
 It is impossible to predict, however, how, if at all, these minimum criteria will affect utilities. The regulation requires states to maintain existing uses of all navigable waters. States must therefore determine the existing uses of all navigable waters within their boundaries and then determine what additional pollution could be allowed and still maintain the existing uses. If the existing uses are high quality, the state must determine whether limited degradation will be allowed as a result of necessary and justifiable economic or social development. If the state decides that a new discharge source will not impair existing uses, even if it will lower water quality, limited degradation of high quality waters is permissible. In cases of potential water quality impairment associated with a thermal discharge, dischargers such as the utilities can be relieved of temperature limitations if the discharger can demonstrate that less stringent limitations will be sufficient to protect a "balanced, indigenous population of shellfish, fish, and wildlife. . . ." If thermal dischargers meet this test, they can avoid any obligations required by an antidegradation policy.
 
 
 15
 None of these minimum criteria preclude degradation. It may be, for example, that a state may determine that a new plant in a given area may discharge without affecting existing uses. Similarly, a state may conclude that economic and social development necessitates limited degradation of high quality waters. Even in situations involving national resource waters where no degradation can be allowed, the antidegradation policy will not necessarily injure utilities. First, each state must determine which waters are to be classified as national resource waters. If a plant does not discharge into a national resource water, it obviously will not be affected. More fundamentally, it cannot be said with any certainty that the prohibition of any degradation of national resource waters will necessarily prohibit new dischargers. A state would have the option of applying more stringent controls to existing dischargers or otherwise limit pollution so that a new plant would be able to discharge without lowering water quality. It is quite possible, therefore, that the antidegradation policy, when implemented into a water quality plan by the states, will inflict no injury on utilities.
 
 
 16
 The antidegradation regulation is merely the first step in an ongoing administrative process which has not yet resulted in an order requiring compliance by utilities. Thus, even if the issue of the validity of the regulations is a purely legal one which will not be aided by development of a factual record, the absence of a coercive order directed at utilities makes the issues in this case unfit for judicial determination. Bethlehem Steel Corp. v. U. S. Environmental Protection Agency, 536 F.2d 156, 161 (7th Cir. 1976).[6]
 
 
 17
 The second tier of the two-part test for ripeness hardship on the parties resulting from the withholding of judicial review presents a more difficult problem. The utilities argue that the challenged antidegradation regulation will not be reviewable in any subsequent proceeding, and therefore that the hardship to the utilities in denying review at the present time makes the controversy ripe.[7]
 
 
 18
 Judicial review of an antidegradation policy may occur when: (1) the state adopts water quality standards; (2) the state adopts a Section 208 water quality management plan; (3) EPA approves state water quality standards; and (4) EPA approves a state's water quality management plan.[8] Despite these possible avenues of judicial review, utilities contend that the underlying question of the validity of the antidegradation regulation will never be subject to challenge. Their argument is bottomed on § 510 of the Act, 33 U.S.C. § 1370, which provides in relevant part:
 
 
 19
 . . . (N)othing in this Act shall (1) preclude . . . any State . . . to adopt or enforce (A) any standard or limitation respecting discharges of pollutants . . . except . . . any . . . limitation . . . which is less stringent than the . . . limitation . . . under this Act . . . .
 
 
 20
 Thus, § 510 preserves the state's authority to adopt limitations more stringent than federal law requires. Consequently, utilities assert, it will be impossible for a reviewing court to determine whether a more stringent state standard was adopted as a result of the antidegradation regulation or as a result of its own initiative.
 
 
 21
 We are unable to evaluate this argument in the abstract. It may be that under a state's own law a state agency will have no independent authority to implement an antidegradation policy and thus it will follow that the policy was adopted pursuant to the federal mandate. It is also possible that a state agency, in adopting or implementing an antidegradation policy, may make it plain that it is doing so only because it is required to by the regulation here challenged. In either case the validity of the federal regulation would be squarely before the reviewing court.[9]
 
 
 22
 On the other hand, a state plan may go beyond the requirements of the federal regulation or may make it plain that the antidegradation policy would have been adopted regardless of the requirements of the regulation. In such a case the utilities are probably correct in asserting that there would be no opportunity to raise the question of the Administrator's authority to promulgate the antidegradation regulations. Union Electric v. EPA, 427 U.S. 246, 265, 96 S.Ct. 2518, 2529, 49 L.Ed.2d 474 (1976). To that extent then, they are correct in arguing that if there is no review now, there may never be review. But, of course, that very example demonstrates why review now is inappropriate. If in fact the states, for reasons wholly independent of the federal compulsion, adopt antidegradation policies as strict or stricter than the ones the Administrator would impose on them, then the promulgation of the regulation, even if unlawful, becomes irrelevant. The utilities would be unable to challenge these regulations, but neither would they have been affected by them.
 
 
 23
 It is also possible that a state agency will adopt an antidegradation policy without giving any indication whether the policy was adopted because of, or in spite of, the federal regulation. In such a case it would seem appropriate, in order to accord an opportunity for review, for the Administrator and the reviewing court to presume that the state decision was dependent on the federal regulation and to entertain a challenge to validity of the regulation at that time.
 
 
 24
 In sum, we are unpersuaded that no further opportunities for judicial review exist to challenge the validity of the antidegradation regulation and therefore do not find the hardship on the utilities of withholding review so great as to make the controversy ripe.
 
 
 25
 For the reasons stated above, the judgment appealed from is Affirmed.
 
 
 26
 PELL, Circuit Judge, dissenting.
 
 
 27
 At the risk of oversimplification, perhaps a perilous course to choose in an area of law beset with a maze of confusing, complex, often confounding, and sometimes contradictory statutes and regulations, I am of the opinion that this is an appeal which should be disposed of by this court reaching the merits and deciding that the regulation imposing an antidegradation policy requirement is wholly without statutory authority, and is therefore without any legal force or effect. Accordingly, I respectfully dissent, which dissent is, by necessity, based in part on my belief that the Congress, and not an administrative agency, is the legislative body of our government.
 
 
 28
 In its initial brief filed in this court on November 18, 1977, the appellants observed:
 
 
 29
 This case was filed in 1975. Partly because of two transfers among members of the (district) court and partly because the government waited seven months to file its motion urging a lack of ripeness, it is already an old case. (Emphasis added.)At that time, the appellants were fearful that EPA's antidegradation regulation, which the appellants contended was illegal, could well accomplish its objective because of states' adopting the policy of the regulation before any final ruling could be made in this litigation. Now, almost two years after the above words were written, the appellants find themselves no closer to a solution of what appears to be a very real problem, both the district court and this court having declined on the technical ground of ripeness to address the merits of the problem.[1]
 
 
 30
 Clear guidelines as to whether either ripeness or standing exist are not easy of pronouncement and indeed the questing reader often could come to the opinion that a dominant motive might be whether a particular court desired to entertain a particular case. In any event, I see no purpose to be served by my endeavoring to expand substantially the literature on the subject as the majority of this panel has now spoken and my undertaking of further expansion would merely contribute to the additional venerability of this case.
 
 
 31
 The substantive issue here is whether the statute gave EPA general authority to create restrictions on the use of waters which are of better quality than is required for fishing and swimming. Either the Congress did give the EPA such authority or it did not. If it did not give the authority, the appellants, in the mid-1970s when the energy crisis was already manifesting itself, were confronted with the possibility of interminable multi-state litigation with regard to standards which were the sequelae of the guidelines of an assertedly unauthorized regulation. The resolution of the substantive issue is simply a matter of law with no need for factual development. The majority opinion itself concedes that this subsequent state-by-state review may never be a real possibility and that the utilities may never be able to challenge the regulation they seek here to challenge. I cannot agree that the utilities would not be affected by the EPA Regulation because the state standards appear to me to be the direct by-product of the challenged regulation.
 
 
 32
 The regulation mandates the adoption of an antidegradation provision containing a set of precise criteria. The full-blown antidegradation requirement in the regulation cannot other than seriously harm the utilities by creating a regime which renders the use of their unlicensed plants under construction prima facie unlawful.
 
 
 33
 As to ripeness, it appears to me that the trilogy of cases of Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) and its two companion cases liberalized the law of ripeness sufficiently that upon the facts asserted in the present case ripeness does exist. What we are really dealing with is that this is not a situation where the court is being called upon to give an advisory opinion but is an area where there is a constitutional case or controversy demanding judicial attention.
 
 
 34
 With regard to standing this, of course, has to do with whether a plaintiff has a sufficient personal stake in a controversy so that the litigation is conducted between real adversaries. The fact that this regulation is, in form, directed toward the states does not deprive these plaintiffs of their personal stake. That proposition was settled long ago in Columbia Broadcasting System v. United States, 316 U.S. 407, 422, 62 S.Ct. 1194, 1203, 86 L.Ed. 1563 (1942):
 
 
 35
 Appellant's standing to maintain the present suit in equity is unaffected by the fact that the regulations are not directed to appellant and do not in terms compel action by it or impose penalties upon it because of its action or failure to act.
 
 
 36
 That proposition was recently reaffirmed in Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977):The injury may be indirect, see United States v. SCRAP, 412 U.S. 669, 688 (, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254) (1973), but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions.
 
 
 37
 Standing seeks only to insure that review occurs between parties who are actually adverse because the acts of one will cause injury to the other. That criterion seems to me surely satisfied here.
 
 
 38
 Finally, assuming ripeness and standing, I see no need for a remand to determine the legal question of whether the statute provides authority for the regulation. A remand would mean only that the district court would then have to consider the brief on the merits which the appellants have presented to us and the case then would presumably come back to this court on the same briefs. That exercise should not be necessary.
 
 
 39
 This Court's right to hear the merits was reaffirmed a few years ago in Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976):
 
 
 40
 The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, see Turner v. City of Memphis, 369 U.S. 350 (82 S.Ct. 805, 7 L.Ed.2d 762) (1962), or where "injustice might otherwise result." Hormel v. Helvering, 312 U.S. (552), at 557 (61 S.Ct. 719 at 721, 83 L.Ed. 1037.)
 
 
 41
 To avoid further prolongation of this dissent with regard to an issue which had not been addressed by the district court, this court, or the EPA itself in its brief, the following points I think are well-established in the appellants' brief: (a) the antidegradation requirement is not authorized by §§ 208 or 303, the purported authority for these regulations; (b) the regulatory programs of the Act are inconsistent with an antidegradation policy; and (c) the legislative history of the Act contains no authority for an antidegradation policy.
 
 
 42
 I add only in conclusion a note of regret that in this period of energy crisis in our country, the resolution of controversies bearing directly upon possible solutions, at least in part, to that crisis have to wend their way along a tortuous technicality-ridden, seemingly endless path before any definitive determination can be reached.
 
 
 
 [1]
 130.17 Water quality standards
 (e) The State shall develop and adopt a Statewide antidegradation policy and identify the methods for implementing such policy pursuant to § 130.10(b)(2). The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:
 (1) Existing instream water uses shall be maintained and protected. No further water quality degradation which would interfere with or become injurious to existing instream water uses is allowable.
 (2) Existing high quality waters which exceed those levels necessary to support propagation of fish, shellfish and wildlife and recreation in and on the water shall be maintained and protected unless the State chooses, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, to allow lower water quality as a result of necessary and justifiable economic or social development. In no event, however, may degradation of water quality interfere with or become injurious to existing water uses. Additionally, no degradation shall be allowed in high quality waters which constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance. Further the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and feasible management or regulatory programs pursuant to section 208 of the Act for non-point sources, both existing and proposed.
 (3) In those cases where potential water quality impairment associated with a thermal discharge is involved, the antidegradation policy and implementing method shall be consistent with section 316 of the Act.
 
 
 [2]
 130.32 Relationship to National Pollutant Discharge Elimination System
 (c) No permit under section 402 of the Act shall be issued for any point source which is in conflict with a plan approved by the Regional Administrator in accordance with this part and Part 131 of this Chapter, provided however, that no such permit shall be deemed to be in conflict with any provision of such plan or portion thereof, hereafter approved, which relates specifically to the discharge for which the permit is proposed, unless the State has provided the owner or operator of the discharge and the interested public with notice and the opportunity to appeal such provision.
 
 
 [3]
 33 U.S.C. 1251(a). The section goes on to state that "it is the national goal that the discharge of pollutants into national waters be eliminated by 1985" and that, "wherever attainable," "an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983."
 
 
 [4]
 The record does not indicate whether any of the states have challenged the antidegradation regulation
 
 
 [5]
 For the text of the antidegradation regulation, see note 1 supra
 
 
 [6]
 Utilities argue that no coercive order requiring the expenditure of funds is necessary for a plaintiff to establish ripeness. Utilities admit that Bethlehem Steel contains language suggesting that such an order is necessary but argue that this aspect of Bethlehem Steel is inconsistent with Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Gardner v. Toilet Goods Ass'n, however, does not support utilities' argument. In that case, the Supreme Court held that a controversy was ripe where petitioners were faced with an immediate choice of either spending substantial sums to comply with the challenged administrative regulations or refusing to comply and facing heavy civil and criminal penalties. Id. at 172-73, 87 S.Ct. at 1529
 The antidegradation regulation in the present case imposes no such dilemma on utilities since it is still uncertain whether the regulation will have any impact on the utilities. This court stated in Bethlehem Steel, supra, holding a controversy not ripe for decision in language equally applicable to the present case:
 The steel and power companies' claims of uncertainty in their business and capital planning are not sufficient to warrant our review of an ongoing administrative process. First, the claims are vague and speculative. They do not involve injuries on the order of the concrete immediate business costs which the Supreme Court relied on to find a pre-enforcement challenge to administrative action ripe for review in Abbott Laboratories, supra, and Gardner v. Toilet Goods Association, 387 U.S. 167 (87 S.Ct. 1526, 18 L.Ed.2d 704) (1967). In those cases the petitioners were faced with the dilemma of either expending considerable sums of money to comply with the administrative orders affecting them or facing serious penalties for noncompliance accompanied by the stigma of transgressing the law which could affect their goodwill. The petitioners in the instant case are not faced with such a dilemma. They need not expend any funds at this time since there is no administrative directive to which they must comply, nor, of course, do they face any sanctions for noncompliance.
 536 F.2d at 162-63.
 
 
 [7]
 In Bethlehem Steel, supra, we stated that if a controversy "will not be reviewable later, our review now may be warranted to protect the right of the parties to have the issues heard in court." 536 F.2d at 163. Seizing on this language, utilities argue that if no review is available later, ripeness follows automatically. In light of our conclusion infra that there are possible avenues for later judicial review, we need not decide whether a controversy is automatically ripe if no further possibilities for judicial review exist regardless of how fit the issues are for review
 
 
 [8]
 The parties seem to agree that the first two of these opportunities for judicial review would be limited to actions brought in the state courts. The utilities state that the review would be inadequate because "the only relevant question, to a state court, is one of state law" (appellants' brief at 20). We do not attempt to determine here exactly what form state review might take but we do note that state courts are competent to and often must and do decide questions of federal law. Review of the Administrator's actions would presumably be available in United States District Court under the Administrative Procedure Act, 5 U.S.C. § 701-706. See U.S. Steel Corp. v. Train, 556 F.2d 822 (7th Cir. 1977); Bethlehem Steel Corp. v. EPA, 536 F.2d 156, 163 (7th Cir. 1976). We need not decide in which forum review will be available. Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 165 n.3, 87 S.Ct. 1520, 1525, 18 L.Ed.2d 697
 
 
 [9]
 Neither Union Electric Co. v. EPA, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976) nor U.S. Steel v. Train, 556 F.2d 822 (7th Cir. 1977), the cases relied upon by utilities, would preclude judicial review. The question in Union Electric was whether the Administrator of the EPA has power to reject a state air implementation plan under the Clean Air Act for technological or economic infeasibility. The Act provides that the Administrator "shall approve" a state plan if it meets eight specified criteria. The Court held, in accordance with the views of the Administrator, that the Administrator has no power to not approve a plan for technological or economic infeasibility since these factors are not enumerated in the eight specified criteria under the Clean Air Act. In reaching this conclusion, however, the Court stated that, "the States may submit implementation plans more stringent than federal law requires and that the Administrator must approve such plans if they meet the minimum requirements . . . ." 427 U.S. at 265, 96 S.Ct. at 2529
 At most, Union Electric establishes that approval by the EPA of a state water quality management plan which goes beyond the minimum criteria established by the antidegradation regulation could not be challenged because § 510 gives the states such authority. If the state water quality standard does not go beyond the minimum criteria of the antidegradation regulation, however, review would not be precluded. If it could be concluded that the state's actions were designed to comply with federal requirements, then invalidation of the antidegradation regulation would also invalidate the state water quality standard.
 U.S. Steel v. Train is no more helpful to utilities. In that case, this court held that the Administrator has no authority to review the validity of a state water quality standard in a permit proceeding since the Act gives the Administrator "no authority to consider challenges to the validity of the state water quality standards in such a proceeding." 556 F.2d at 835. This court did not hold, however, that there could be no judicial review of the Administrator's approval of a state water quality standard or state water quality management plan.
 Thus, neither Union Electric nor U.S. Steel v. Train precludes all possibilities of judicial review of the validity of the antidegradation regulation in federal court.
 
 
 [1]
 In the district court, almost as an afterthought, there was a one line reference to plaintiffs' having failed to demonstrate sufficient injury to give them standing for the suit. The majority opinion in this court rests only on ripeness but recognizes that it is a case in which the concepts of standing and ripeness merge